[No. 23730-0-II. Division Two. April 28, 2000.]

FRANCHOT E. SMITH, ET AL., *Appellants*, v. THE EMPLOYMENT SECURITY DEPARTMENT, *Respondent*.

---

[8]*See, e.g., State v. Berlin*, 133 Wn.2d 541, 554, 947 P.2d 700 (1997) (Alexander, J., dissenting).

[9]*Berlin*, 133 Wn.2d at 547.

[10]*Berlin*, 133 Wn.2d at 547-48.

*Charles Stephen Ferguson*, for appellants.

*Christine O. Gregoire, Attorney General*, and *John Francis Dziedzic* and *Stewart Arthur Johnston, Assistants*, for respondent.

SEINFELD, J. — Franchot Smith brought this action against his former employer, the State of Washington Employment Security Department (Department), claiming constructive wrongful termination; negligent hiring, retention and supervision; and negligent infliction of emotional distress. The trial court granted summary judgment to the Department, finding that Smith had failed to exhaust his administrative remedies and had failed to establish a prima facie case to support his claims. Smith claims that the exhaustion of remedies requirement is inapplicable because the Department failed to provide a safe workplace, thereby violating public policy. But as he has failed to make a prima facie case of a violation, we affirm.

FACTS

In August 1983, the Department hired Smith to work in the Disabled Veterans Outreach Program at the Job Service Center (JSC) in Bellingham. Ronald Halfhill, a co-worker, held the same position and the two enjoyed a "pretty good" relationship.

In early 1986, Halfhill left the agency but he asked to be rehired in January 1987. Because of deficiencies in Halfhill's earlier work habits, the JSC manager required, as a condition of reemployment, that Halfhill agree to certain conditions designed to improve his job performance. Shortly thereafter, Smith began to consider Halfhill's performance to be substandard.

In September 1987, JSC promoted Smith to unit supervisor; his new duties included supervising Halfhill. According to Smith, Halfhill became increasingly uncooperative and the Smith-Halfhill relationship deteriorated. Smith re-

ported to supervisors that Halfhill elbowed him as they passed in the hallway; followed him around the office disrupting his conversations with others; and directed long, hostile stares at him. Co-workers were aware of the angry bickering between the two.

Smith expressed his fear and frustration with Halfhill to JSC Administrator David Cowling and told Cowling about at least one incident, a hallway bumping encounter. Cowling investigated, but he was unable to find a witness to corroborate Smith's claim. Cowling then told Smith and Halfhill that they had a "personality conflict" and must learn to get along.

From 1987 through 1992, Smith's duties included evaluating Halfhill's work performance. On one occasion, Smith attempted to file an evaluation indicating Halfhill's poor performance, but his supervisor persuaded him to raise Halfhill's ratings. Thus, Halfhill's written evaluations contained no indication of a problem between the two men other than Halfhill's comment that he would "benefit greatly" from improved communications with Smith.

In February 1992, Smith requested a demotion from his supervisory position. He did not mention Halfhill as a reason, citing only stress and health factors.[1] Then, in August of that year, Smith requested a six-month leave of absence without pay. This time he cited the recent end of his 28-year marriage, several major surgeries in 1990, and the death of his 25-year-old son as reasons for the request. Again, Smith did not mention Halfhill.

In March 1993, after Smith returned from his leave of absence, the verbal conflicts between Smith and Halfhill resumed. Supervisors counseled them; counseling session records indicate that each blamed the other for instigating the conflicts and viewed the other as having the potential to be dangerous to himself and others. Supervisor Pete Lee opined that both were contributing to the problems.

When the conflicts continued, supervisors brought in a facilitator from Employee Advisory Service (EAS) for help.

---

[1] In September 1990, Smith was diagnosed with heart disease and underwent a triple bypass surgery.

In preparation for the meeting with the EAS facilitator, Smith wrote a summary of his problems with Halfhill. In this document, Smith conceded that he was unable, despite his "better judgment," to ignore Halfhill's provocations and instead responded angrily to them. He also admitted that he left a "caustic" and insulting note on Halfhill's desk and that he once communicated to Halfhill a desire to hit him.

Following the EAS meeting, Smith wrote a "footnote" to his original summary of problems with Halfhill. In it, he noted a "profound" change in Halfhill's behavior toward him and stated that Halfhill had "dropped his personal harassment campaign" against him.

Nonetheless, Smith placed his name on a transfer list, and when no transfer opportunities had become available by September 1994, he gave notice that he would leave his job on December 1. In his resignation letter, Smith cited unspecified concerns about stress, various health problems, and his inability to handle the "public contact and the public relations nature" of the position. Again, he did not mention Halfhill.

Then, on October 17, 1994, Smith heard that Halfhill's wife had filed for divorce. According to Smith's later testimony, Smith believed that Halfhill's emotional stability rested on a stable marriage and that Halfhill's marital difficulties could cause Halfhill to act out. Smith submitted a second letter of resignation, this time effective immediately. Smith's letter contained only one reason for the request: Smith's fear of Halfhill's potential for violence against him.

During this period, Smith did not seek relief through his union's grievance process or utilize any administrative civil service remedies. Further, he admitted that Halfhill never caused him any physical injury, never threatened to do so, and, to Smith's knowledge, never directed any physically intimidating behavior toward anyone else.

In September 1996, Smith sued the Department, claiming constructive wrongful termination; negligent hiring, retention and supervision; and negligent infliction of

emotional distress. The Department moved for summary judgment, arguing that Smith had failed to exhaust available administrative remedies and had failed to present sufficient legal bases or evidence to support his claims. The trial court granted summary judgment, dismissing Smith's claims with prejudice.

## DISCUSSION

The Department argues that Smith, as a public employee subject to the State Civil Service Law (ch. 41.06 RCW), had a duty to exhaust his administrative remedies before commencing a civil lawsuit. Smith responds that he brought his complaint under the Washington Industrial Safety and Health Act (WISHA), not under chapter 41.06 RCW, and, thus, the exhaustion requirement does not apply.

The general purpose of the Civil Service Law is to

> establish for the state a system of personnel administration based on merit principles and scientific methods governing the appointment, promotion, transfer, layoff, recruitment, retention, classification and pay plan, removal, discipline, training and career development, and welfare of its civil employees, and other incidents of state employment. All appointments and promotions to positions, and retention therein, in the state service, shall be made on the basis of policies hereinafter specified.

RCW 41.06.010.

This statute also provides for a personnel resources board (the Board), which is empowered to adopt rules for the "reduction, dismissal, suspension, or demotion of an employee." RCW 41.06.110 and .150; *see Reninger v. Department of Corrections*, 79 Wn. App. 623, 631, 901 P.2d 325 (1995). Pursuant to this authority, the Board adopted a comprehensive set of merit system rules governing the terms and conditions of state employment. *See* Title 356 WAC; *Reninger*, 79 Wn. App. at 631.

The Civil Service Law and the Board's regulations give civil service employees the right to appeal any violation of civil service or merit system rules to the State Personnel

Appeals Board (PAB). RCW 41.06.170(2); WAC 358-20-010 and -020; *Reninger*, 79 Wn. App. at 631. The employee then has the right to appeal the decision of the PAB to the superior court. RCW 41.64.130 and .140.

■ As we stated in *Reninger*, "This elaborate system of rules, procedures, and remedies provides a vehicle and forum created specifically to resolve civil service employment relations claims." 79 Wn. App. at 631. But if a wrongful discharge claim involves a violation of public policy, the courts do not require exhaustion of contractual or administrative remedies. *Smith v. Bates Technical College*, 139 Wn.2d 793, 991 P.2d 1135 (2000).

Smith contends that the violation of a public policy exception applies here. He argues that because his complaint alleged a violation of WISHA, it was not necessary for him to seek administrative relief before commencing a civil lawsuit.

■ *Bates* involved a wrongful termination claim. After discussing the general principle of exhaustion, the *Bates* court explained when the principle is not applicable:

> In general, a party must exhaust all available administrative remedies prior to seeking relief in superior court. The court will not intervene and administrative remedies must be exhausted when: (1) a claim is cognizable in the first instance by an agency alone; (2) the agency has clearly established mechanisms for the resolution of complaints by aggrieved parties; and (3) the administrative remedies can provide the relief sought. The principle is founded on the belief that the judiciary should give proper deference to the body possessing expertise in areas outside the conventional expertise of judges.
>
> . . . As we have explained, the tort of wrongful discharge seeks to vindicate the public interest in prohibiting employers from acting in a manner contrary to fundamental public policy. Because the right to be free from wrongful termination in violation of public policy is independent of any underlying contractual agreement or civil service law, we conclude [the plaintiff] should not be required to exhaust her contractual or administrative remedies.

139 Wn.2d 808-09 (citations omitted).

Smith asserts that WISHA contains a clear mandate of public policy supporting safe workplaces. He further contends that the Department violated this public policy by failing to protect him from Halfhill. But as he has failed to support the latter contention with evidence in the record, the trial court did not err in granting summary judgment.

■ When reviewing a summary judgment, this court engages in the same inquiry as the trial court and reviews the evidence de novo. *Lilly v. Lynch*, 88 Wn. App. 306, 311, 945 P.2d 727 (1997). Summary judgment is appropriate only if, after viewing the pleadings, depositions, and affidavits and all reasonable inferences therefrom, in the light most favorable to the nonmoving party, one can state as a matter of law that (1) there is no genuine issue of material fact, (2) all reasonable persons could reach only one conclusion, and (3) the moving party is entitled to judgment. *Olympic Fish Prods., Inc. v. Lloyd*, 93 Wn.2d 596, 602, 611 P.2d 737 (1980).

■ A "material fact" for the purposes of summary judgment "is one upon which the outcome of the litigation depends." *Geppert v. State*, 31 Wn. App. 33, 39, 639 P.2d 791 (1982). If the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case," there can be no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

WISHA is a codification of the common law duty requiring employers to provide employees a reasonably safe place to work. *McCarthy v. Department of Soc. & Health Servs.*, 110 Wn.2d 812, 818, 759 P.2d 351 (1988). WISHA's purpose statement reads:

> The legislature finds that personal injuries and illnesses arising out of conditions of employment impose a substantial burden upon employers and employees in terms of lost production, wage loss, medical expenses, and payment of benefits under the industrial insurance act. Therefore, in the public interest for the welfare of the people of the state of Washington and in order to assure, insofar as may reasonably be possible,

safe and healthful working conditions for every man and woman working in the state of Washington, the legislature . . . declares its purpose by the provisions of this chapter to create, maintain, continue, and enhance the industrial safety and health program of the state . . . .

RCW 49.17.010. This statute, by referring in broad terms to the protection of the workplace health and safety of every citizen of this state, shows a legislative intent to set forth a clear mandate of public policy.

The courts of this state have not addressed whether a plaintiff claiming a WISHA policy violation must exhaust administrative remedies. Assuming that WISHA policy expresses the type of public interest that should be independent of contractual or civil service laws, nonetheless, a plaintiff may not merely allege such a violation and thereby avoid exhaustion requirements. Rather, the plaintiff must set forth specific facts that demonstrate the violation. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 232, 685 P.2d 1081 (1984) (cause of action in tort for wrongful discharge will lie where "the discharge of [an] employee contravenes a clear mandate of public policy").

Here, Smith has failed to raise an issue of material fact as to the Department's violation of WISHA policies. There is no evidence that the Department breached the standard of care that an employer must exercise: that is, exercise the precaution of an ordinarily prudent person in keeping the workplace reasonably safe. *McCarthy*, 110 Wn.2d at 818.

The record contains no evidence that Smith's supervisors were or should have been aware that Halfhill had dangerous tendencies. Halfhill had not been physically threatening to Smith or anyone else and there was no basis to conclude that he posed a particular danger to his co-workers. They had been alerted only to personality conflicts between him and Smith.

The supervisors took appropriate steps by first counseling Smith and Halfhill themselves, then calling in an EAS facilitator to try to resolve the conflicts. The record does not show that they ignored or minimized the problem; instead, they attempted to resolve each dispute between the two men as it was called to their attention.

Further, there is no evidence that Halfhill was, in fact, dangerous. While we recognize that employee rage can endanger a workplace, here there is no showing that the Department could or should have acted in some way other than the way it did. Because the record indicates that the Department's actions were those of an ordinarily prudent person, Smith has failed to show that the Department breached its duty of care toward him under WISHA standards.

Because Smith has not shown a public policy violation, he is not excused from pursuing available administrative remedies before seeking additional remedies in superior court. As he failed to exhaust these remedies, the trial court properly granted summary judgment on this basis.

Finally, the evidence necessary to show that the Department violated a public policy also is necessary to support Smith's specific tort claims. Because this evidence is absent, the trial court did not err in concluding that Smith failed to present a prima facie case to support his claims.

We affirm.

ARMSTRONG, C.J., and HUNT, J., concur.